UNITED ST TES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

CRIMINAL NO. 14-cr-20425

v.

HON. JUDITH E. LEVY

BENJAMIN BEIGHTOL,

Defendant.

_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**

Benjamin Beightol, who has served just over two years of his ten

year prison sentence for his leadership role in a RICO conspiracy

involving the Latin Counts, files a motion seeking compassionate

release. By facilitating communications between the incarcerated Latin

Count President and gang members "on the outside," Beightol

encouraged gang members to commit acts of violence, including murder

and robbery, on behalf of the Latin Counts. Beightol's motion should be

denied.

Beightol does not qualify for compassionate release. "[T]he mere

existence of Covid-19 in society and the possibility that it may spread to

1

a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a non-dangerous defendant facing a heightened risk from Covid-19 could demonstrate "extraordinary and compelling reasons" for release, Beightol does not have a chronic condition that places him at increased risk for severe complications from Covid-19. His reasons for release are therefore not "extraordinary." His conviction and criminal record also establish that he is dangerous, preventing him from showing a "compelling" justification for release. And the § 3553(a) factors likewise do not support release because Beightol was only sentenced two years ago, previously failed to abide by conditions of release, and the nature and circumstances of the offense combined with his history and characteristics are serious.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Beightol, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population

to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of December 14, 2020, this process has already resulted in at least 18,728 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Beightol's motion for compassionate release.

## Background

Beightol was one of the leaders—the minister of information—of the Latin Counts, "a violent group that inflicted terror in a community." (R.444, PgID.2501). The Latin Counts focused on ensuring that rival gangs and the members of their community fear them. To accomplish this, they brazenly engaged in violent acts in the middle of the day and in public. They murdered people who disrespected them. They randomly attacked members of their own community. They sold drugs, used guns, and carried themselves as if they were above the law. Beightol was immersed in this gang culture. He led meetings, collected dues, and

most importantly, facilitated communications between incarcerated Latin Counts and those on the outside. Beightol also played a significant role in making decisions about who would hold higher ranking positions within the gang.

Beightol ultimately was charged with one count of RICO Conspiracy. (ECF No. 273, PageID.1217). Beightol pled guilty pursuant to a Rule 11 plea agreement. (ECF No. 403, PgID.2037). As part of the negotiated plea, Beightol and the government agreed that the guideline range was life, but agreed to a sentence of 120 months. (*Id.,* PgID. 2042, 2044). Absent the plea agreement, Beightol would have faced a sentence of 240 months, which is the statutory maximum penalty for RICO conspiracy. (PSR ¶ 110). Consistent with the terms of the plea agreement, on June 12, 2018, the Court sentenced Beightol to 120 months in prison. (ECF No. 431, PgID.2332).

Beightol is currently incarcerated at Manchester FCI. He is 32 years old, and his projected release date is December 10, 2026. Beightol has moved for compassionate release, claiming that he has hypothyroidism and lung scarring and that these conditions make him more vulnerable to Covid-19, particularly at Manchester FCI where he

is incarcerated. Beightol also claims he has been rehabilitated, as evidenced by his having gained various skills while incarcerated and having no disciplinary infractions. Many of Beightol's claims are unsupported, and regardless, none of these reasons qualify him for a reduced sentence.

## Argument

## I.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its

plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the
Bureau of Prisons has restricted inmate movement within and between
facilities. *Id.* When new inmates arrive, asymptomatic inmates are
placed in quarantine for a minimum of 14 days. *Id.* Symptomatic
inmates are provided with medical evaluation and treatment and are
isolated from other inmates until testing negative for Covid-19 or being
cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified
operations to maximize physical distancing, including staggering meal
and recreation times, instating grab-and-go meals, and establishing
quarantine and isolation procedures." *Id.* Staff and inmates are issued
face masks to wear in public areas. *See* BOP FAQs: Correcting Myths
and Misinformation. When visitation is permitted at an institution, the
visits are non-contact, require masks, and social distancing between
inmates and visitors is enforced, either via the use of plexiglass (or
similar barriers), or physical distancing (i.e., six feet apart). Visitors are
screened for Covid-19 symptoms and their temperature is checked.
Visitors who are sick or symptomatic are not allowed to visit, and
inmates in quarantine or isolation cannot participate in social visiting.

*See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times. And at Manchester FCI, where Beightol is serving his sentence, these precautions are working. As of the date of this filing, there currently is a low incidence of Covid-19 infections with only one inmate and 19 staff members that have tested positive. There have been no deaths among inmates or staff at Manchester. *See* BOP Covid-19 Website.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen

the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 8,045 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 18,728. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he

system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal

9

activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452

11

F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Beightol's motion for compassionate release.

Beightol's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the

administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. The government does not dispute that Beightol has met the exhaustion requirement.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote

13

respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.    Beightol has not shown "extraordinary and compelling reasons" for compassionate release.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), contains two overlapping requirements for scrutinizing an inmate's initial eligibility for release. First, an inmate must demonstrate that "extraordinary and compelling reasons" warrant a reduction in his sentence. *Id.* Second, release must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* That applicable policy statement *should* be USSG § 1B1.13, which contains various criteria related to a defendant's medical conditions, age-related issues, family circumstances, or other reasons, USSG § 1B1.13 cmt. n.1, and which requires that the defendant "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). That policy statement should be binding here, as the analogous policy statement in USSG § 1B1.10 is for sentence reductions under 18 U.S.C. § 3582(c)(2). *See Dillon v. United States*, 560 U.S. 817, 819 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). Recently, however, a Sixth

14

Circuit panel concluded in *United States v. Jones*, ___ F.3d ___, No. 20-3701, 2020 WL 6817488, *6 (6th Cir. Nov. 20, 2020), that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release.

     *Jones*'s analysis on that point was incorrect, and the government preserves for further review its argument that USSG § 1B1.13 is binding here and that Beightol's age and medical conditions fail to satisfy its requirements. Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

     But even if the Court were to follow the dicta in *Jones*, Beightol has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a sentence reduction. Even if not mandatory, § 1B1.13 continues to "provide a working

definition of 'extraordinary and compelling reasons,'" which can "guide" a district court's decision "without being conclusive." *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; *see also Jones*, 2020 WL 6817488, at *9 (quoting with approval a prior panel's observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

That statutory language, rather, requires that a defendant satisfy two strict criteria to be initially eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). *First*, the defendant's reasons must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22,

2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3
(E.D. Mich. Jan. 31, 2020). *Second*, the defendant's reasons must be
"compelling"—meaning "so great that irreparable harm or injustice
would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3.
A defendant must establish both criteria to satisfy the statute's
eligibility threshold. Beightol has not done so.

   *First*, Beightol's reasons for release are not "extraordinary."
*Everyone* in our society faces a risk from Covid-19 right now. Over
300,000 Americans have now died from this terrible disease. So as the
Sixth Circuit has stressed, "generalized fears of contracting Covid-19,
without more," do not justify compassionate release. *United States v.
Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020);
*accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2
(6th Cir. May 21, 2020); *United States v. Ramadan*, No. 20-1450, 2020
WL 5758015, at *2 (6th Cir. Sept. 22, 2020). The Bureau of Prisons has
also worked diligently to implement precautionary measures reducing
the risk from Covid-19 to Beightol and other inmates. *See Wilson v.
Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere
existence of Covid-19 in society and the possibility that it may spread to

17

a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Because Beightol does not have a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from Covid-19, his reasons for release are not "extraordinary" and instead present only a "generalized fear[] of contracting Covid-19." *Jackson*, 2020 U.S. App. LEXIS 32269, at *6. Beightol maintains that he has hypothyroidism and lung scarring which puts him a higher risk of severe illness. (ECF No. 492, PageID.2718; ECF No. 500, PageID.2762). The government does not dispute that he has hypothyroidism based on information contained in his PSR and BOP medical records. But Beightol's claim of lung scarring is wholly unsubstantiated. Beightol's BOP medical records lack any indication that his lungs are compromised. *See* Exhibit A, Beightol's BOP Medical Records 2019 (sealed) and Exhibit B, Beightol's BOP Medical Records 2020 (sealed). And, at the time of sentencing just two years ago, Beightol did not report to the Probation Department that he had any

medical issues regarding his lungs—only that he was stabbed in the left arm and left leg in 2002 or 2003, and that he suffers from hypothyroidism. (PSR ¶¶ 84, 85). Beightol's hypothyroidism, while substantiated, is well-controlled by medication as demonstrated by two different thyroid function blood tests conducted on November 11, 2020, which indicated that Beightol's thyroid function was within normal levels.[1] *See* Exhibit B, Beightol's BOP Medical Records 2020 (sealed), at p. 37 (showing Free T4 level of 1.22 ng/dL and TSH level of 0.896 mIU/mL).

Regardless, hypothyroidism and lung scarring are not recognized by the CDC as known, or even potential, Covid-19 risk factors. The CDC maintains a running list of conditions that are known to place someone at a higher risk of severe illness from Covid-19 as well as a list of conditions that *might* result in increased risk. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19 and the medical conditions that might increase someone's risk from Covid-19). Beightol's health conditions are

---

[1] *See* https://my.clevelandclinic.org/health/diagnostics/17556-thyroid-blood-tests/test-details (describing that the normal Free T4 test range is 0.9 − 1.7 ng/dL and the normal TSH test range is 0.40 − 4.50 mlU/mL).

not included in either list. The cases cited by Beightol in support of his claim that the government has acknowledged that hypothyroidism increases risk of severe illness from Covid-19 are inapposite. The cited cases all involved defendants who had health conditions that the CDC has acknowledged as causing increased risk of severe illness, such as obesity (*United States vs. Bayne*, 2:15-cr-127-NR, 2020 U.S. Dist. LEXIS 199399 (W.D. Pa. Oct. 27, 2020)) and Type 2 Diabetes (*United States v. Thomas*, No. 18-40033-01-DDC, 2020 U.S. Dist. LEXIS 14215 (D. Kan. Aug. 10, 2020)). (ECF No. 500, PgID.2765). The government in those cases conceded based on the health conditions that are recognized by the CDC as causing a known increased risk of severe illness from Covid-19. Beightol, to the contrary, does not have such a condition. And because Beightol is only 32 years old, he also does not face the same risk from the disease that the elderly do. The combination of his well-controlled hypothyroidism and age, even when considered alongside the Covid-19 pandemic, thus does not rise to the level of an "extraordinary" circumstance.

*Second*, Beightol's reasons for release are not "compelling." In the pretrial release context, the Sixth Circuit has already addressed what

qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.*

Beightol's circumstances are even less compelling. The "original grounds" for Beightol's incarceration here were that he was involved in a RICO conspiracy and played a leadership role in a violent criminal street gang. His conviction for that offense, especially when combined with his limited but violent criminal record, showed that Beightol

required a sentence of 120 months in prison. It also showed that Beightol is dangerous, as contemplated under USSG § 1B1.13(2), which should continue to "guide" the Court's analysis here. *Gunn*, 2020 WL 6813995, at *2. And unlike the pretrial defendant in *Bothra*, Beightol was *convicted* of his offense here—not just accused of it. So the justice system's "essential" interest in finality weighs far stronger against Beightol's release than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489 U.S. 288, 309 (1989).

### B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–

22

89 (6th Cir. 2020) (same). So even if the Court were to find that Beightol established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Beightol's long remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. The Court in this case described in detail how the ten year sentence it imposed—which was half of the applicable guideline sentence of 240 months—adequately reflected the 3553(a) factors. (R.444, PageID.2506). The notion that this sound

3553(a) analysis has changed just two years into the sentence defies logic and reasoning.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Beightol, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

The nature and circumstances of Beightol's offense are undoubtedly serious. This is why absent the plea agreement, he would have faced the statutory maximum sentence of 240 months which capped the applicable guideline range of life in prison. He served a leadership role in a RICO conspiracy that reigned terror in the community through acts of violence including murder and assault. Beightol himself has a documented history of violence. He became a Latin Count in prison while serving a term of 42 to 120 months for a

24

violent assault on his step-father. (PSR ¶ 59). While serving a prison sentence for that assault, he incurred an overwhelming 36 misconducts including multiple assaults on fellow inmates and staff. (*Id.*). Despite Beightol's assurances to the Court during his allocution at sentencing that his gang activity and violence was in his past, it appears that he is continuing on the same path of violence. On November 16, 2020, Beightol was disciplined for fighting with another inmate.[2] *(*Exhibit C, Inmate Discipline Data). An 80-percent reduction in Beightol's sentence would fail to reflect the seriousness of the offense or provide just punishment for his conduct. Such a drastic reduction just two years after the Court pronounced that ten years would be an appropriate sentence for Beightol would erode respect for the law—telling the public and victims that even leaders of extremely violent gangs that facilitated acts of murder, assault, and narcotics trafficking can be granted a windfall release some day—while undermining deterrence.

---

[2] Beightol represented to this Court in his initial request for compassionate release that he had no disciplinary infractions while in BOP custody. (R.492, PageID.2719). While this was true at the time, it became untrue as of November 16, 2020. Beightol chose not to correct this representation in his supplemental letter to the Court which he wrote just days after he was disciplined. (ECF No. 499, PageID.2750). And he incorrectly represented that he had no disciplinary infractions in his 12/1/2020 supplemental filing by counsel. (R.500, PageID.2763, 2773).

Beightol's record also casts significant doubt on whether he would abide by the release conditions and social-distancing protocols that could diminish his risk of contracting Covid-19 if released from custody. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. It depends on a long list of variables, including the precautions at his prison, the number of Covid-19 cases there, the prison's medical facilities, his access to medical care if released, and the threat from Covid-19 at his release location. A defendant's risk of contracting Covid-19 also depends not just on his opportunities for social-distancing, but on his willingness to take advantage of those opportunities and engage in social-distancing for the pandemic's duration. Contrary to his claim that he "was compliant with all bond conditions during his pre-trial release," Beightol has demonstrated that he will not abide by release conditions set by this Court. (ECF No. 500, PageID.2762). While under pretrial supervision for this case, the defendant violated the terms of his bond. Beightol was prohibited from frequenting Southwest Detroit – gang territory – and associating with any known Latin Counts. Only hours after removing

26

the defendant's tether he was found in Southwest Detroit in a vehicle with a strong smell of marijuana emanating from it. Beightol was in the vehicle with fellow Latin Counts – a fact he later admitted at a violation hearing. He was returned to home detention with a tether. (ECF No. 343, PageID.1583). On or about May 9, 2018, Defendant's bond was revoked after he was again found to be in violation of its terms. The petition for action indicated Beightol continued to contact incarcerated Latin Counts and communicated with Latin Counts on social media on multiple occasions. (ECF No. 418, PageID.2236). Beightol is unlikely to abide by release restrictions and is thus more likely than most people to expose himself and innocent people to Covid-19.

## III.   If the Court were to grant Beightol's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Beightol's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Beightol's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

*/s/ Frances Lee Carlson*
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9696
Email: frances.carlson@usdoj.gov

Dated:  December 15, 2020

## Certificate of Service

I hereby certify that on December 15, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Kimberly Stout

/s/ Frances Lee Carlson
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9696
Email: frances.carlson@usdoj.gov